v. Smyth, Case No. 18-13272. And we'll wait just a moment before we get started. All righty. Mr. Robinson, whenever you're ready. Thank you. Good morning. Good morning, counsel. My name is Jevin Sloan. It's actually Jevin Robinson Sloan. I apologize. Thank you. That's okay. I represent the appellant John D. Carruth. Unfortunately, this case does not involve the use of knives and shanks, but it does involve a complete loss of a man's livelihood. Mr. Carruth served Alabama One Credit Union and its members for over 30 years, the last 18 years of which he was a CEO. And the record is undisputed and clear regarding the tremendous growth and success that the credit union enjoyed under his tenure. Mr. Carruth found his 30 plus year career come to an abrupt halt on the credit union administration, the ACUA, conserved the credit union, and shortly thereafter, the administrator of the ACUA, Sarah Moore, as the acting conservator, terminated the employment agreement under which Mr. Carruth had performed for almost 16 years. We brought this case alleging that private individuals in Tuscaloosa, Alabama, the Appalese, conspired with the office of the governor and other state officials to have improper and unwarranted regulatory sanctions imposed against Mr. Carruth in Alabama One through the ACUA, leading ultimately to his termination on August 25th. One of the difficulties I'm having with the structure of this entire argument is that Alabama has a, by state law, has created a review mechanism for superintending these agencies, and that agency has made this decision, and I'm not sure how you collaterally attack that decision. If you accept the legality of the decision made by the state for which it has provided a complete set of reviews, I'm not sure how any of your cases can proceed because the injury that your client suffered was the product of the decision by a board of independent people, who are not defendants in this case, and who made that decision. Your Honor, there's several different ways I'd like to answer that question. I'm just backing away at the big picture. I understand all the conspiratorial moves, the politics, all this stuff going on there, but fundamentally, if I read this record, you had an agency that made this decision, and you don't sue them, you bypass them, and it's sort of an indirect challenge to the decision made by that institution. That's the reaction I have from one judge's reaction to it. And, Judge Ian Botham, if I could clarify one fact that you just said. Mr. Kruth did bring an action in the Alabama statute that allows him to challenge the decision to conserve, and I think it's important to not conflate the two decisions that were made on August 27, 2015. There was one decision made to conserve the credit union. That is the decision that Alabama law allows terminated individuals to challenge, the decision to conserve. That same statute, though, the second decision, which was a decision by Sarah Moore, not the board of the ACUA, a decision by Sarah Moore to terminate Mr. Kruth's employment agreement. There is no provision for review of that decision under Alabama law, other than through the section 1983 case that we're bringing here. But did not the commission make a recommendation with regard to the removal of staff? Was there any recommendation made by the commission as to the remedy to be imposed for the condition that they found the union to be in? I'm sorry, the agency to be in? Well, there was a recommendation of conservatorship. Yes. That recommendation was made by Sarah Moore to the board. And so the relevance, I think, of that, and the district court really did in its analysis where Your Honor is ending it, was there a stated basis, the agency stated basis for the decision to conserve, but that cannot be the end. I understand your argument that to conserve, as you refer to it, is essentially a form of receivership. That is, they have made that recommendation and it was based on an examination of the underlying financial condition, et cetera, et cetera, with regard to the long-persisting concentration of debt, which is not being cured, the concentration with one lender, the used car dealer in the Tuscaloosa area, et cetera. And that was not being corrected. That was all before the agency to put it into conservatorship. And I thought that what went with that was a recommended remedy for that was to remove at least Mr. Caruth. Well, there's two problems factually. I'm not asserting those facts. I want you to help clarify that. I'll do so. The first is the board did not make the decision to terminate Mr. Caruth. I understand that. The Saramore made the decision to terminate Mr. Caruth at once. So when the board conserved— What did the board do with regard to the staff? Nothing. The board conserved Alabama One Credit Union and then all of the powers of the conservator in the actual order of conservatorship, all the powers of the conservator were delegated to Saramore alone. So every decision made thereafter was her decision. Now, there's also—I don't want it to be left uncorrected that Your Honor said there were persisting problems with this overconcentration problem. That's the Danny Butler situation. That is factually incorrect. And there's never been an allegation that they did not correct the Danny Butler overconcentration issue. And in fact, I think it's important, and this is something the district court— and that weaves its way throughout the opinion—is the district court recognized and acknowledged that we had shown improper influence and improper direction back in 2014 when the ACA was led by Larry Morgan. And Larry Morgan carried out a suspension of John D. Caruth at the direction of the office of the governor, knowing full well he testified under oath. There was no basis. He did not make that decision. He had his job threatened. And so he chose to carry out an unlawful directive from the office of the governor and suspend Mr. Caruth. The district court acknowledged we had established an agreement between the appellees and the office of the governor to exert that improper influence over the ACA. But then the court drew a bright line of demarcation between the Morgan-led ACA administration and the subsequent Moore—Saramore-led ACA administration and said, no, that administration was clean. Look at the confidential addendum to the order of conservatorship. End of story. Well, there's several problems with that bright line of demarcation. And the first one is the district court simply ignored mountains from west Texas. These are mountains to me. Mountains of circumstantial evidence that we had put before the court. And that kind of reminds me of something my grandfather used to say when I was growing up in a small town in Texas. And when he saw something that looked a little shady, he would say, you don't have to see the skunk to know it's there. And fortunately for Mr. Caruth, that's exactly, that's right in line with the law on the evidentiary standard on summary judgment for a plaintiff to show a conspiracy. Just like the skunk, there's many ways a conspiracy can reveal itself, and circumstantial evidence is enough. But don't you have to get more in this? I mean, so without Moore, without links here, this is the lawsuit that you brought against these two nongovernmental lawyers. And we have the allegations of at the very least lobbying the governor's office and whatnot. But if you can't bring in Moore, the ultimate decision maker, how do you get anywhere in this lawsuit? And that is a point the district court made. There's a problem with that for one particular reason. And the court basically kind of grafted over its decision in the Moore case and said for the same reasons I granted summary judgment for Mrs. Moore, I grant summary judgment here. And we're going to hear the argument on Mrs. Moore's case here in a little bit. We believe we were right there, and we'll talk about that later. But we don't have to prove, unlike the Moore case where we do have to prove that she was so involved in conspiracies such that she can be liable, we don't have to do that here. We don't have to show that Mrs. Moore was part of the conspiracy. We can show that she was an instrumentality of the conspiracy. And if the decision to terminate Mr. Caruth was a result of the conspiracy that we have established between the appellees and the office of the governor, that's enough. And it doesn't matter if Mrs. Moore even knew a conspiracy existed. It doesn't matter if she knew the appellees were in on the conspiracy. What we have shown is she was improperly influenced and directed by the office of the governor at a time when the appellees and the office of the governor were secretly conspiring. The timeline that the evidence paints here is very compelling, and it was completely disregarded and thrown out by the district court. You start, as I said, with the Morgan administration, which the district court accepted. That was tainted. The decision to suspend Mr. Caruth in 2014 was tainted. But then the district court ignored the following. There was an uninterrupted continuum of dealings between the appellees and the office of the governor continuing through the Moore administration. The office of the governor and the appellees, two people at the district court, agreed with us that they had an agreement to influence the ACUA to take action against Mr. Caruth in Alabama 1. You have the circumstances of Mrs. Moore's appointment. At the time she was appointed, in the interim period between Larry Morgan being the administrator and Sarah Moore, there was an interim administrator. He's here in the courtroom today. It was Lloyd Moore, a longtime employee of the agency, who was appointed as the interim administrator, and when he was a corporate rep during his 30B6 deposition, he conceded. He wanted to be the administrator. He sent Governor Bentley a letter saying, thank you for this interim appointment. Please make me the administrator. He was passed up. And who was he passed up for? David Byrne's former colleague and good friend, Sarah Moore. No credit union experience. But surely you understand how executive appointments work. I mean, you're describing the course of executive appointments on the state level, on the federal level. There are any number of career officials who would like to become the political appointee, and they don't. Nothing you have described is actionable thus far. It's not actionable in itself. Circumstantial evidence often isn't. But we're compiling a pile of circumstantial evidence. But doesn't the involvement of Moore and the criticism that's leveled at Moore, because she wasn't the administrator that your client would have preferred, doesn't it all rest upon the we don't like the appointment process and who was picked? No. No, it doesn't. We didn't know anything about Mrs. Moore when she was appointed. What we do know now, based on discovery, is that at the time she interviewed for the appointment, this is a time when there were no regulatory sanctions pending against Alabama 1 and Mr. Carruth. And Larry Morgan had testified under oath. There was no reason to even have any more regulatory inquiry. Alabama 1 had solved the Danny Butler problems, and it was smooth sailing. During the interview, Governor Bentley told Mrs. Moore, Alabama 1 is a big problem that you're going to have to take care of. And within weeks of her taking office, she began the process of doing that, not based on new information that Larry Morgan hadn't seen. She'd only been in office a few weeks. But by the fact, and we're not going to get into the details, she has a report that she relies on. Doesn't that take all of the other circumstantial evidence, as you are referring to it? Doesn't that take it all out of the picture? If she has a report she relies on? Your Honor, I would encourage the court to look at that report in conjunction with the report of Les Alexander that we submitted. And the district court relied solely on that report and said that's the end of the story. This is the reason why the credit union was conserved. The Alexander report goes through point by point and demonstrates that these weren't just differences of opinion. There is objective data, point by point, falsities, inaccuracies, miscalculations. And this was supposedly, and I see my time is up. May I briefly finish my answer? Yes, please do. You would presume that from the examination report that was done in June 2015, Mrs. Moore would have picked the best, most compelling evidence to include in the order of conservatorship that justified the highest sanction available under Alabama law. And the Alexander report demonstrates adequately that this best evidence was worthless. It was riddled with inaccuracies. So I think that's another item of circumstantial evidence that goes along with this very compelling timeline that this is not the work of independent examiners and an independent administrator. This was an administrator following a directive from the office of the governor having an end result in mind and trying to cobble together a justification for it after the fact. What is the illegality? The illegality? Yes. You're talking about a conspiracy, but a conspiracy requires a legal objective. With deprivation of constitutional rights, Your Honor. That's question-begging. My question is there is no abstract constitutional talk about an agreement itself. The question is you have to have a conspiracy or an agreement or understanding to achieve the object of which is to achieve some objective which is illegal or otherwise forbidden, either civilly or criminally. And I'm not sure I follow what that is. Somebody lost a job. Yes. And a bunch of other people agreed that y'all got to not be there. So what? I mean, I guess I don't get the point. Well, it would be he had a employment agreement, which is a protected property interest that was deprived of Subject to what? Subject to Independent of what his employer He could not be terminated under his agreement, period. We don't take issue with the fact that the credit union administration could terminate him. The fact that they could terminate him without What the statute says is he could be terminated without any liability to the credit union or the agency for the termination itself. His agreement has provisions that entitle him to money if he's terminated. He cannot be terminated without cause. And so he had an existing property interest that the state came in and took from him with no due process and no compensation. He didn't get pre-deprivation process. And according to the district court, he doesn't get post-deprivation process either. And it was the conspiracy to deprive him of those constitutional rights, the due process that we've alleged here. His constitutional right was to get paid by his employer. Well, the constitutional right was The constitutional right was Or it's a contract that he had. He could sue for breach of contract. The constitutional right was for him to be afforded due process before his property interests were taken from him. And that was that in this case. But so if I have a contract and I think it's been breached, then I can, instead of suing for breach of contract, I can say, well, you breached my contract. That deprives me of a constitutional right. Well, the state of Alabama was not a party to the contract. So there's not a breach of contract action available to him. He might have one against the credit union, but that's not what we're here to talk about. Wait a minute. He had a contract. Assume it was enforceable against someone. It's a contract. Well, the other part of the contract was the credit union. But what we're here today talking about is the state came in, not as a party to the contract, but as a regulator. And the state took away an existing property interest from him with no due process and no compensation. Okay. Thank you, Your Honor. Thank you, Counsel. You have reserved two minutes for rebuttal. May it please the Court. My name is Austin Huffaker. I have the pleasure of representing the appellees, the attorney defendants in the case. Your Honors have all focused on the very concerns that we've had from this case from day one. This is one of four cases pending in federal court. All four of them are up on appeal. The string that the plaintiff attempts to tie to all of the cases is this so-called conspiracy. What is the conspiracy? The conspiracy is, in a broad form, is you've asked to violate some sort of constitutional right, but in response to the question that Your Honor asked, you never got an answer about what the constitutional right was. That's because there has not been any. In fact, he was terminated. He's afforded due process in terms of challenging that, and he's still in the process of doing that. And I assume when this… What is that process he has? Well, he's challenging the conservatorship, and by virtue of that, challenging the legality of the conservator to operate under that conservatorship. But the acknowledgment, Your Honor, is, and I thought this was a very key admission, is that his recourse is really a breach of contract claim against the credit union, and he's under a six-year statute to do that. So technically, he can file that claim within up to 2021, and presumably he will do so. Something else that you said, Judge Brent, and I agree with it. All that my clients were guilty of doing is lobbying. That's all they did was were passionate advocates for their clients. Nothing more. That's all that the emails show, and nothing less. It does not show an agreement of any shape, form, or fashion. They lobbied, and no different than what I'm doing before Your Honors today, and that's lobbying for a particular outcome. The other issue I want to address, and it goes to your question, Judge Higginbotham, and it's about the decision-makers. What's interesting on this particular case is that the decision-maker with respect to determination was Ms. Moore, but the preceding background on that is that she made the decision to terminate based upon recommendations by federal and state examiners. None of those individuals are alleged to have been part of any kind of conspiracy. In fact, I have no idea who those examiners may have been. Those examiners did conduct contact examinations of the credit union in 2014 and 2015. They also authored the report of examination in 2015. I've not seen it. My clients have not seen it. In fact, the oral argument after this is sealed because I'm not allowed to see it. Now, presumably, what's in that report of examination are the very reasons in which Mr. Carruth was terminated. And again, I haven't seen it, but I'm willing to bet what is not in it is Jay Smith, the Lewis Smith Law Firm, or Al Lewis. And what will be in that report of examination are all kinds of other things that the examiners found that were going on there at the credit union. That report of examination, those involvements of the examiners, are what disconnects any causal link between anything my clients may have said and any resulting outcome of a regulatory action. The district court's decision, when you look at it, whether you couch it under looking at the constitutional law violation claims or the state law violation claims, the disconnect and the problem the district court had was this causal connection. What was it? And they did not make that connection because you had 14 months between the dates of predominant of the emails that my client sent to the ultimate regulator action of the termination in 2015. And of course, in that time frame, you had the involvement of the examiners, you had interactions between management and the credit union, with the credit union itself. Most of those things have not been rebutted in the case, and most of those have nothing to do with Jay Smith. I'm assuming, since we haven't heard about it, that the suspension is not an issue in this case. It's been waived. The issue in this case is strictly the termination. And the evidence in the record is that there is no connection whatsoever. On the suspension, the district court clearly got it right in terms of the lack of a constitutional injury under the stigma plus test. There was a suspension. It was definite. It was with full pay and benefits, so there was no constitutional injury there. The same issue with the termination. The contract could be terminated by the regulator with and without cause. One issue that I know Mr. Sloan did not bring up, but it is an issue in front of the court, and that's the dismissal of Jay Smith in this case. Mr. Smith passed away in 2017. He's the author of all the emails. I did file a suggestion of death with respect to Mr. Smith. I did properly serve, of course, Mr. Sloan with it. The issue has been, well, did I, and not serving any particular non-party with that suggestion of death, did that render some sort of defect as it concerned the 90-day clock for purposes of the dismissal of Mr. Smith ultimately? And the answer clearly was no. There was no estate for Mr. Smith. There was no personal representative for Mr. Smith. There was no estate that had been closed because there had been disbursements made to air, so there was no non-party at all to make any type of, to file any type or serve any type of suggestion of death with him. Your Honor, quite honestly, if Your Honors have any questions, feel free to ask me, but I think all the questions you've asked are very much what the issues in the case are, and then there's been no connection whatsoever between Mr. Smith and the ultimate action. The one thing I do want to point out on the emails, if you read the emails, and undoubtedly you have, there's nothing that Mr. Smith said in any of the emails that was not otherwise backed up by sworn testimony in the case. That would be sworn testimony from Lori Ramos-Baird, who was the whistleblower in the case, and if you remember, there are affidavits from her in which she testifies to various improper or wrongful conduct at the Craigian. There was also testimony of the underlying four cases. Your Honor, unless the Court has any further questions, I respectfully request the Court affirm the opinion. Thank you, Mr. Hoffaker. Mr. Sloan? Thank you, Your Honor. First and foremost, the suspension claim has not been waived. I think the briefing makes that clear. In my primary argument, I was simply going in the direction the Court took me, but I certainly did not intend to waive that argument, and in fact, the Hardeman decision, as we point out, creates an exception to the stigma plus rule when there's evidence of bad faith. We say we've given evidence of bad faith. The Court actually acknowledged that as to Morgan's 2004 suspension, there were real problems, so we have not given up that claim. I also want to touch once again on some of the concerns Judge Higginbotham pointed out in some of the argument Mr. Hoffaker just presented regarding due process. It is simply not true that we are afforded due process for the decision to terminate the employment agreement under the Alabama statute. While the fact that he was terminated gives him standing to challenge the conservatorship, it is not the decision to terminate that he has any standing to challenge. His only means to challenge that decision is through a Section 1983 case, and in fact, I don't want this fact to be lost on the panel either. The Alabama statute, on its face and according to the courts holding below, it guts his breach of contract claim against Alabama I Credit Union as well. That's a big problem. The Alabama statute says that neither the agency nor the credit union can be liable for the agency terminating that agreement. So according to Judge Kugler, he can't bring a suit against the regulators under Section 1983, and in the manner in which the district court upheld that statute and claimed that it was still constitutional, he can't even bring a direct action against the coward party to that contract. So the constitutional concerns are manifest, especially when you consider this is a contract he had performed under for 16 years. It was an existing contract at the time that that statute was enacted in 2014. Unless the court has any further questions, I'll stand by the argument as well as our briefs. Thank you, Mr. Sloan. Thank you. All right. We are going to take a few minutes just to clear the courtroom for the last case, and we will return at 1120. All rise.